1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   Mary D. Linich,                    )   No. CV-05-2983-PHX-MHM
                                       )
10              Plaintiff,             )   **ORDER**
                                       )
11  vs.                                )
                                       )
12                                     )
    Broadspire Services, Inc.; Towers Perrin)
13  Long-Term Disability Plan,         )
                                       )
14              Defendant.             )
                                       )
15  _____)

16

17

18

19          Currently pending before the Court is Defendant's Motion for Summary Judgement.

20  (Dkt.#55.)   Towers Perrin funds and maintains the Plan for which Broadspire is the claim

21  administrator.    Plaintiff  Mary Linich worked as an administrative assistant for Towers

22  Perrin before being diagnosed with Fibromyalgia and Chronic Fatigue Syndrome ("CFS"),

23  which Linich alleges prevented her from being able to perform her work duties or any other

24  occupation for which she is suited.   Linich applied for and began receiving long-term

25  disability (hereinafter "LTD") benefits from Towers Perrin on June 1, 1999.   To remain

26  eligible for LTD benefits under the Plan, a claimant must show that she is unable to perform

27  her job for the first 130 weeks that she is disabled.  After 130 weeks, a claimant is required

28  to show that she is unable to perform any occupation for which she is reasonably suited based

on her education, training, and experience.  A claimant must also demonstrate that she remains under the care of a licenced medial practitioner.  On July 17, 2003, Broadspire notified Linich that it would be conducting a review of her LTD benefits claims.  On May 12, 2004, Broadspire terminated Linich's LTD benefits effective June 22, 2004.  Linich subsequently appealed the plan administrator's determination.  After Broadspire issued its final denial of benefits on July 6, 2005, Linich had exhausted all mandatory administrative remedies under the plan and was  entitled to file suit in federal court under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*.  On September 22, 2005, Linich filed suit against Defendants Broadspire Services, Inc. ("Broadspire") and Towers Perrin Long-Term Disability Plan (the "plan") to recover lost benefits, including prejudgment interest, enforce her right to future benefits, and recoup attorney's fees and costs. (Dkt.#1, p.5.)

On April 15, 2008, the Court issued an Order in which it determined that the appropriate standard of review in this case would be abuse of discretion, rather than *de novo* review. (Dkt.#54); *see* Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989) (holding that a court reviews an ERISA challenge to a denial of benefits as an abuse of discretion "if the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."); see also  Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955 (9th Cir. 2006) (en banc).   After extending discovery deadlines for a 45 day period, the Court further held that no evidence had been presented suggesting Broadspire possessed a conflict of interest in administering Towers Perrin's plan.  Thus, the only issue that is squarely before the Court is whether the plan administrator abused its discretion in denying Linich's LTD claim.

### Legal Standard

Summary judgment is normally granted when the pleadings and court documents demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.   See Fed. R. Civ. P. 56.  However, that standard shifts in the ERISA context.  "When the decision to grant or deny benefits is reviewed for

abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999).

An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact. Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan, 410 F.3d 1173, 1178 (9th Cir. 2005). Courts have also asked whether the administrator acted in good faith in reaching a determination. See McDaniel v. Chevron Corp., 203 F.3d 1099, 1113 (9th Cir. 2000). The Ninth Circuit has cautioned that when district courts "review for abuse of discretion, it is because the plan has put the locus for decision in the plan administrator, not in the courts," and the district court should not be in the habit of substituting its own judgment for that of plan administrators. Jordan v. Northrop Gruman Corp. Welfare Benefit Plan, 370 F.3d 869, 875 (9th Cir. 2003). The court's role is instead limited to whether the decision is "grounded on *any* reasonable basis." Id. (emphasis in original). In other words, the relevant inquiry is not whose interpretation of plan documents is most plausible, but whether the plan administrator's interpretation is unreasonable. McDaniel v. National Shopmen Pension Fund, 817 F.2d 1370, 1373 (9th Cir. 1987).

A court may overturn a plan administrator's discretionary judgment for clear error only when the decision is plainly unsupported by substantial evidence in the administrative record. Snow v. Standard Ins. Co., 87 F.3d 327, 332 (9th Cir. 1996) (quoting Maynard v. City of San Jose, 37 F.3d 1396, 1404 (9th Cir. 1994)). Substantial evidence means "relevant evidence reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." Id. Clear error also occurs when the reviewing court is left with the "definite and firm conviction that a mistake has been committed." Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 623 (1993); Boyd, 410 F.3d at 1178.

1    Nevertheless, "deferential review is not no review."   Hess v. Hartford Life &
2    Accident Ins. Co., 274 F.3d 456, 461 (7th Cir. 2001).  Even when reviewing for an abuse of
3    discretion, the district court is not required to simply "rubber stamp the administrator's
4    decision."   Jones v. Metropolitan Life Ins. Co., 385 F.3d 654, 661 (7th Cir. 2004).  Indeed,
5    the Supreme Court has recently reaffirmed the principle that ERISA "sets forth a special
6    standard of care upon a plan administrator" to exercise its discretion "solely in the interests
7    of the participants and beneficiaries of the plan," providing a "full and fair review" to
8    claimants.   Metro. Life Ins. Co. v. Glenn, __ U.S. __, 128 S.Ct. 2343 (2008).

9    **Background**

10   Sometime in 1997, Linich began to feel ill with flu like symptoms. (PSOF ¶ 11.)
11   Around that same time she began seeing an infectious disease specialist, Dr. Christopher
12   Crow, for treatment.  Throughout the early part of 1998, Dr. Crowe ran a variety of
13   laboratory tests to pinpoint the cause of Linich's symptoms, which included fever, persistent
14   muscle and joint pain, headaches, a general malaise, and so forth.   These tests proved to be
15   inconclusive, and in March 1998, Dr. Crowe referred Linich to Dr.  Ralph Bennet, a Phoenix
16   area rheumatologist.  (PSOF Exhibit #1, p. 312.)[1]  Dr. Bennett's initial observations led him
17   to make a preliminary diagnosis that Linich was suffering from fatigue associated with a
18   prolonged recovery from mononucleosis.  (PSOF ¶ 18.)   However, as laboratory tests
19   continually failed to demonstrate an infection or virus, and as Linich's symptoms showed
20   little signs of abatement, by August 1998, Dr. Bennett began to suspect the presence of CFS.
21   (PSOF ¶ 21.)   In August 1998, Dr. Crow completed a re-evaluation of Linich, where he

22   _____

23   [1] In her briefing, Linich suggests that the administrative record, upon which
     Broadspire made its ultimate decision, must have been incomplete, since Broadspire's
24   counsel was not able to produce the entire record during discovery—Linich claims that some
     500 plus pages were missing. There is, however, no evidence to support this assertion. Even
25   if Broadspire inadvertently produced less than the entire file to Linich, it does not logically
26   follow that Broadspire must have necessarily lacked access to those missing pages when it
     considered and denied Linich's LTD claim.   The Court has seen no evidence that would
27   allow it to conclude that Broadspire made anything less than Linich's complete medical file
28   available to its appellate claim handlers.

1   noticed that her symptoms had not changed for almost 11 months.  (PSOF Exhibit 1, p. 312.)

2    Then, after Linich's productivity at work began to noticeably decline, she was encouraged

3   to apply for short-term disability benefits by her employer, Towers Perrin, for which she was

4   approved in October 1998. (PSOF ¶ 4.)  In November 1998, Dr. Bennett conducted a follow-

5   up evaluation of Linich where he concluded that she suffered from CFS, and "may have

6   difficulty" returning to work. (PSOF ¶ 24.)

7          In January 1999, Dr. Crowe filled out what would be the first of several Attending

8   Physician Statements ("APS") for Towers Perrin, and later Broadspire, where he described

9   Linich's symptoms as severe in nature, stating that she was still unable to return to work, and

10  would not be able to do so until December 1999, at the earliest. (PSOF ¶ 25-26.)  Dr. Crowe

11  noted Linich's symptoms now included "debilitating fatigue, memory loss and muscle pain."

12  (Id.)  Dr. Crowe's APS also indicated that Linich had mentally declined, and that she had

13  an "inability to remember things, focus, read or comprehend simple material." (PSOF Exhibit

14  1, p. 72.) (describing and quoting Dr. Crowe's report from April 30, 1999.)  Linich returned

15  to see Dr. Bennett in September 1999, where he discussed the use of anti-depressants and

16  prescribed a trial run of the drug Paxil.  (PSOF ¶ 28.)  When Linich returned for two follow

17  up visits in late 1999, complaining of difficulty "doing anything over 1 hour," Dr. Bennett

18  performed a physical examination of the tender points on her body and observed the

19  inflamation of various Fibromyalgia trigger points.  (PSOF ¶ 30.)  Dr. Bennett quickly

20  concluded that Linich was afflicted with Fibromyalgia.  (Id.)   At the same time, Dr. Bennett

21  also noticed Linich's ability to move around normally had declined, and that she was

22  suffering memory loss and a decreasing ability to communicate.  (PSOF ¶ 33.) He conducted

23  various blood testing to rule out other causes.  (PSOF ¶ 33-34.)

24         Around July 1999, Towers Perrin notified Linich that Intracorp, a disability

25  management firm, would assist it in dealing with employees who had been suffering from

26  long-term illnesses.    Shortly thereafter, Intracorp hired Dr. Kevin Ladin to conduct an

27  independent review of Linich's disability claim.  (PSOF ¶ 35-36.)  After reviewing Linich's

28  medical records, Dr. Ladin found no disability as defined under the plan, noting that upon

1   neurological examination "the patient appears awake, alert and oriented . . . . [s]peech is clear,

2   fluent and appropriate." (P.74.)   Dr. Ladin went on to postulate that Fibromyalgia and CFS

3   are:

4           somewhat controversial diagnosis with respect to both etiology and treatment.
            Although some physicians consider both conditions to be disabling, the

5           medical literature supports increased activity with avoidance of a sedentary
            lifestyle to be therapeutic. As a result, it is my opinion this patient should not

6           be considered disabled and in fact should be encouraged to resume gainful
            employment and maintain compliance with a regular program of exercise. A

7           resumption of gainful employment may in fact prove therapeutic for this
            individual, in my opinion.

8
            Based on objective clinical findings and utilizing the <u>AMA Guidelines</u>, there

9           is no evidence of a permanent functional impairment. I do not believe this
            patient warrants any specific work restrictions, and would in my opinion be

10          capable of working on a full-time basis.

11   (PSOF Exhibit 1, p. 71-76.)   Dr. Ladin also observed Linich's symptoms of brain fog,

12   insomnia and difficulty waking up in the morning. (Id.)

13           In response to Dr. Ladin's conclusion that Linich was not disabled, Intracorp referred

14   her case to a second independent medical examiner, Dr. Sen Jou, an infectious disease

15   specialist. (PSOF Exhibit 1, p. 89, 83.)   In September 1999, Dr. Jou examined Linich and

16   reported back to Towers Perrin that "the patient cannot return to work [in] her previous

17   occupation." (PSOF Exhibit 1, p. 84.)   Dr. Jou estimated that the probable time for such a

18   return might be towards the end of the 1999.      Dr. Jou also recommended an exercise

19   routine, anti-depressants and a follow up visit with a psychiatrist.   Ultimately Dr. Jou

20   determined that Linich's prognosis for recovery was with a "good attitude, . . . probably

21   good." (Id.)

22           In October 1999, Towers Perrin approved Linich for LTD benefits, which were

23   retroactive to June 1, 1999. (PSOF Exhibit 1, p. 78.)   To continue remaining eligible for

24   LTD payments, the plan required, among other things, that Linich apply for Social Security

25   Disability benefits.   If approved, the plan would off-set and recover any payment received

26   from the Social Security Administration. (PSOF Exhibit 1, p. 84, 94.)   In January 2000, the

27   Social Security Administration found Linich disabled under the Act, and awarded her

28

payments backdated as of July 1999.[2]    (PSOF ¶ 47.)   Linich continued to have regular follow-up visits with Dr. Crowe throughout 2000, where he observed that no significant changes in the intervening months had occurred with respect to Linich's symptoms. Moreover, in a December 2000 re-evaluation, Dr. Crowe noted that Linich was "sleeping more than 20 hrs per day," appeared "confused at times," and was incapable of driving. (PSOF ¶ 48.)

In 2001, Kemper National Services became plan administrator for Towers Perrin. (PSOF ¶ 65.)    During that year, Linich remained under the care of Dr. Crowe, who continued to observe Linich's unchanged symptoms. (PSOF ¶ 49-51.)  Later, in June 2002, Dr. Crowe directed Linich to undergo several laboratory tests—all of which turned up negative. (PSOF ¶ 54-55.)  In September 2002, Kemper requested proof of continuing disability from Drs. Crowe and Bennett, asking them to complete an APS, Estimated Functional Capacity Evaluation ("EFCE"), and Evaluation of Physical Abilities ("EPA"), provide chart notes, diagnostic testing, and a current treatment plan and progress. (PSOF ¶ 68.)  Dr. Bennett, in his EFCE, indicated that Linich could not sit for longer than four hours, could not stand or walk for more than 3 hours, and could only occasionally drive a car, balance, bend, squat, climb, and reach above shoulder level.  (PSOF ¶ 70-71.)  While in his APS, Dr. Bennett noted Linich's prognosis was "poor," that "her marked fatigue precludes regular employment," and her physical impairment was a Class 5–meaning she was "incapable of sedentary work." (PSOF ¶ 72.) Dr. Bennett also noted that Linich had reached maximum medical improvement.  (PSOF ¶ 73.)   With respect to Dr. Crowe, his EPA noted that Linich's overall functional and strength activity was "sedentary," which was the lowest available choice for a physician to select, given the structure of Broadspire's questionnaire. (PSOF ¶ 71.)

---

[2]The Social Security Administration found that Linich's disability was continuing as of March 5, 2004.  (PSOF Exhibit 1, p. 350.)

1    On July 17, 2003, Kemper notified Linich that it was conducting a review of her

2  benefits claim.  Approximately one month later, Linich was re-evaluated by Dr. Crowe, at

3  which time she complained of debilitating fatigue—claiming that she could not stand long

4  enough to perform a simple task like washing the dishes.  Dr. Crowe referred Linich to Dr.

5  Robert Biesbroeck for an endocrinology evaluation, where she was subsequently diagnosed

6  with Type II diabetes.  (PSOF ¶ 56-57.)

7    In late 2003, Broadspire Services Incorporated became plan administrator, taking over

8  from Kemper.  There is some confusion as to what occurred next.  Apparently, in November

9  2003, Broadspire requested a portion of Linich's medical documentation from Drs. Crowe

10  and Biesbroeck. (DSOF ¶12.)  Strangely, there is no evidence in the record to suggest that

11  Dr. Bennett received a similar documentation request from Broadspire, despite his long

12  history of treating Linich.  Furthermore, the information that was requested from Drs. Crowe

13  and Biesbroeck was not comprehensive in that it did not include Linich's complete medical

14  file.  Instead, Broadspire only requested records relating to Linich's "patient charts from the

15  last 10 visits," "the most recent diagnostic test results," the most up to date "treatment plan

16  and progress," and a APS and Functional Capacity Evaluation form that Linich's physicians

17  were to fill out and return.   ( DSOF Exhibits 7, 8.)    In any event, Drs. Crowe and

18  Biesbroeck did not respond to that request.  Then, in December 2003, after having not

19  received any information, Broadspire contacted Linich to notify her that her physicians had

20  yet to respond to its inquiry.  (See DSOF ¶13; PSOF ¶84.)  Broadspire's letter asked Linich

21  to provide medical documentation to support her claim, but only documentation that dated

22  back to January 1, 2003.  After that attempt proved to be futile, in January 2004, Broadspire

23  again attempted to contact Dr. Crowe.  This letter ambiguously requested documentation "for

24  the past six months." (Id.)   Still having not heard anything from Linich or her doctors, on

25  Febraury 13, 2004, Broadsprire sent another letter to Linich, reiterating its request for

26  updated "medical records, including all chart notes and diagnostic results for the last year of

27  treatment."  ( PSOF Exhibit 1, p. 260.)  Ultimately, on February 20, 2004, Dr. Crowe

28  submitted the requested documentation to Broadspire.   Given the unfortunate narrowness

of the information requested, Dr. Crowe's submission only totaled 8 pages in length, and included a single APS and EPA, some progress notes from office visits, and one consultation report from Dr. Briesbroeck.   (See DSOF ¶16; PSOF ¶87.)

At some point in early to mid 2004, Broadspire determined that it would either be conducting a new review of Linich's LTD claim or continuing the review process begun by Kemper. As such, on March 18, 2004, Broadspire referred Linich's case to an independent physician for analysis. (DSOF Exhibit 14.)   For reasons unknown to the Court, the information that was forwarded to Dr. Nelson Zide, the reviewing physician, included only what had been sent to Broadspire by Dr. Crowe on February 20, 2004.   With that limited amount of information in hand, Dr. Zide conducted his peer review of Linich's LTD claim. Dr. Zide's review stated that "[t]he records reviewed do not demonstrate any evidence of physical examination characteristics that would support" a finding of myalgias, arthralgias, insomnia, fatigue and memory loss. (Id.) Dr. Zilde went on to note:

> There is no examination available for review and there are no records suggesting a specific disability. The Physical Abilities Evaluation reports a Class 5 physical impairment and a Class 2 mental/nervous system impairment. There is no explanation for the reasons in reviewing the rest of the data available.
>
> I have attempted to call and speak with the claimant's attending physician, an infectious disease physician, Dr. Crowe. I called once 3/3/04, twice on 3/4/04, and again on 3/5/04. I was told on 3/3/04 that the physician would call me in the morning of 3/5/04, but he failed to call and when I called back I was told he would get back to me in the afternoon.  I gave my cellphone and office numbers but have not yet heard from him by the evening of this dictation.  In view of same I have no alternative but to find no support for functional impairment that would preclude work of any nature."

(Id.)

Also in March 2004, Broadspire conducted an Employability Assessment Report. (DSOF Exhibit 17.)   As was the case with Dr. Zide's peer review, the employability assessment evaluator appeared to have had access to only the Febraury 20, 2004 documentation–along with Dr. Zide's report.    In the "Vocational Background" section of the assessment it states that Dr. Crowe had listed Linich as "sedentary in all functional activity." (Id.)   The evaluator also noted that he had spoken with Linich, who had indicated

"that her activities on a normal day are limited to 4 hours per day and if she did activities for 6 hours she would be down for a week," and that she could not be considered a "reliable employee."  (Id.)   The evaluator then performed a transferable skills analysis and found Linich's work skills,  "clerical and highly skilled usually associated with highly organized and well developed cognitive functioning."  (Id.)  The evaluator went on to note that he had analyzed Linich's claim in light of Dr. Zide's report, and had "us[ed] this medical assessment" to guide the  transferable skills analysis which he had performed.   (Id.) Ultimately, the Employment Assessment determined that Linich was capable of performing a variety of occupations: (1) contract clerk, (2) paralegal, (3) administrative assistant, (4) foreign student advisor, (5) utilization coordinator, and (6) legal investigator.  The report concluded by recommending that a Labor Market Survey be conducted to analyze whether Linich's "current skills and aptitudes as demonstrated through her former work experiences suggest she may be capable of engaging in the competitive employment in any of the positions listed above." (Id.)

Broadspire then conducted a Labor Market Survey on March 31, 2004, for the aforementioned purpose of determining whether job opportunities consistent with the Employability Assessment Report were available in Linich's local labor market.  (DSOF Exhibit 18.)  Like the employability assessment, the market survey noted that it had relied heavily on Dr. Zide's peer review report, along with an extended telephonic interview with Linich.  Ultimately, the market evaluator recommended seven openings in the Mesa, Arizona labor market which "appear[ed] to meet the medical restriction as stated by Dr. Zide."  (Id.)  The first position listed was a legal secretary with the following job description: "Prestigious international law firm in Phoenix has opening for a litigation paralegal . . . high computer usage . . . [t]he position is very document intensive . . . very strong computer skills." (Id.)  The second position was for an administrative assistant: "answering phones, running reports, typing/data entry and greeting guests." (Id.)  The next position was also as an administrative assistant: "must be organized, able to work in chaotic environment."  (Id.)   The fourth position was similar, requiring "administrative and office support activities for multiple

1  supervisors . . . receiving and directing visitors . . . requires strong communication skills."

2  (Id.)   The fifth listed position was again for an administrative assistant: "excellent

3  organizational, analytical, time management skills along with the ability to set priorities and

4  manage multiple tasks within short-time frames and with minimal supervision.   Strong

5  decision making skills, with strong interpersonal and communication skills."  (Id.)   The

6  remaining two positions listed in the report are comparable, in that they were all searching

7  for candidates "comfortable working in an office," capable of greeting "incoming clients,"

8  "multi-task," and possessing "excellent customer service skills."  (Id.)

9      On April 12, 2004, Broadspire notified Linich that it was conducting a review of her

10  LTD claim, and that as a preliminary matter, the plan found no support that Linich was

11  incapable of performing work of any nature.  (DSOF Exhibit 15.)   The letter was almost

12  exclusively made up of verbatim quotes directly lifted from  Dr. Zide's peer review report.

13   The letter also informed Linich that she would be permitted  to supplement her file and

14  present additional evidence of a continuing disability under the terms of the plan.   In

15  response, on April 26, 2004, Dr. Crowe submitted a re-evaluation to Broadspire detailing

16  Linich's  medical history.  (PSOF Exhibit 1, p. 312.)

17      On May 12, 2004, Broadspire officially denied Linich's LTD claim.   Linich was

18  notified via letter that, "[b]ased upon medical review [Broadspire had] concluded that the

19  medical documentation does not support your disability status as defined by [the] LTD plan."

20  (DSOF Exhibit 16.)   Broadspire informed Linich that her benefits were to be discontinued

21  effective June 1, 2004.   The May 2004 denial of benefits letter appears to focus primarily

22  on the Employability Assessment Report and the Labor Market Survey, as well as Dr. Zide's

23  medical report.   Indeed, the denial letter reads as though it was summarizing or re-stating

24  the employment and labor reports.   The letter also states that Linich would be given the

25  opportunity  to  provide  a  written  appeal,  which  should  include  "current  medical

26  documentation from [a] health care provider . . . [and] data such as: diagnostic test results .

27  . . specific functional abilities, including any and all restrictions and limitations.  (Id.)  On

28  July 22, 2004, Linich filed an appeal of the denial of benefits.  (DSOF Exhibit 19.)  On

1   appeal, Linich provided Broadspire with additional medical documentation from her treating

2   physicians, including the aforementioned April 2004 evaluation conducted by Dr. Crowe, an

3   APS submitted by Dr. Bennett, and additional evaluation report from Dr. Crowe.  (DSOF

4   Exhibits 20-22.)

5        In preparing to handle Linich's appeal, Broadspire contacted several independent

6   physicians to review Linich's benefits claim.   (PSOF ¶¶ 115-16.)   Unlike Dr. Zide, these

7   reviewers appeared to have had access to Linich's complete medical history.  The first of

8   Broadspire's reviewers was Dr. Thomas Hoffman, an infectious disease specialist, who found

9   that Linich's medical records failed to support any functional impairment that would

10  preclude work of any type. (PSOF ¶¶ 117-18.)  Dr. Hoffman  noted that Linich could only

11  point to subjective symptoms and had no objective findings to support her claimed loss of

12  stamina or functionality.    Dr. Hofffman wrote, "[a]s is the case with chronic fatigue

13  syndrome, the symptoms may be concerning and troubling, but objective data to support

14  functional impairment in this process is lacking."  (Id.) The second peer review physician

15  was Dr. Elana Mendelssohn, a clinical and neurpsychology specialist, who also concluded

16  that Linich's file "does not support functional impairment from a neuropsycholgical

17  perspective." (PSOF ¶¶ 122-24.)  Among other things, Dr. Mendelssohn found, "[m]ost of

18  the documentation pertains to the evaluation and treatment of the claimant's various medical

19  conditions and do not address her mental status." (Id.)    Dr. Jacques Caldwell, a

20  rheumatology specialist, prepared a third peer review report, which stated that Linich was

21  not precluded from working any occupation as of June 2004.  (PSOF ¶¶ 119-20.)    Dr.

22  Caldwell noted that he had attempted to speak with Dr. Bennett twice, but "on neither

23  occasion did he have her chart available."  (Id.)  Moreover, Dr. Caldwell wrote that on April

24  26, 2004, Dr. Bennet had stated that Linich was capable of performing sedentary work.[3]  The

25

26        [3]Linich strongly contests that such a remark was ever made, and indeed, the Court
    cannot find supporting evidence that would verify its accuracy.  In fact, such a comment from
27  Dr. Bennett seems to run counter to all of his other statements found in the administrative
28  record.

1  fourth reviewing physician, Dr. Tamara Bowman, an endocrinologist, focused on Linich's
2  medical history as a diabetic.  (PSOF ¶ 121.)

3       On August 10, 2004, Broadspire upheld its original decision to terminate Linich's
4  LTD benefits.  (DSOF Exhibit 24.)  Broadspire's proffered justification was as follows (1)
5  Rheumatology: There was "no clinical evidence of immunologic or muscoskeletal
6  abnormalities," Dr. Bennett indicated that Linich was capable of performing sedentary work,
7  and that when contacted by Broadspire's peer review doctors, he did not have Linich's chart
8  available.  (Id.)  (2)  Infectious Disease:  "[I]n the medical documentation submitted, no
9  active infections were identified. Attempts to contact Dr. Crowe were unsuccessful." (3)
10  Endocrinology: Linich had been diagnosed with diabetes and hyperlipidemia by Dr.
11  Biesbroeck, but he was unable to provide any clinical findings that would preclude Linich
12  from working based on these conditions. (4) Depression and Memory Loss:  Neither Dr.
13  Crowe nor Dr. Bennett provided examination findings regarding Linich's cognitive abilities,
14  and no records were submitted from Linich's psychologist.  Lastly, "the medical evidence
15  does not document an intensity and severity of psychological symptomology" that would
16  prevent Linich from performing any occupation.  (Id.) In the same letter, Broadspire notified
17  Linich that she could lodge a final appeal.  In doing so, Linich was advised to provide
18  additional medical data, including but not limited to, detailed consultation notes, abnormal
19  diagnostic tests, formal mental status evaluations, performance based tests of
20  neuropsychological functioning with standardized scores, behavioral observations of
21  symptoms, or any other pertinent information.  On April 28, 2005, Linich transmitted her
22  final appeal to Broadspire.  (PSOF ¶ 131.)

23       On July 6, 2005, Broadspire issued its final decision, upholding the termination of
24  LTD benefits. (PSOF Exhibit 1, pp. 1090-92.)  Before doing so, Broadspire contacted four
25  more peer review doctors to review Linich's claim: Dr. Wendy Weinstein, an internal
26  medicine specialist; Dr. Yvonne Sherrer, a rheumatoloist; Dr. Lawrence Burstein, a
27  psychologist; and Dr. Mitchell Rosenfeld, an infectious disease specialist.  Dr. Weinstein
28  found that Linich's diabetes did not render her disabled under the terms of the plan.

1    Similarly, Dr. Sherrer concluded that although Linich has multiple subjective complaints,

2    "subjective complaints of pain in and of themselves do not determine functional ability" and

3    "cannot be said to determine that she is not able to work at any other occupation."

4    Furthermore, according to Dr. Sherrer, reasonable restrictions on Linich's potential future

5    occupations "would be that she would not be at a job that would require heavy lifting,

6    prolonged standing, or prolonged walking, and that she would be at a job that would allow

7    for frequent shifting positions." Dr. Sherrer agreed with positions taken in the Employability

8    Assessment Report. Likewise, Dr. Burstien, found that any alleged impairments in Linich's

9    cognitive functioning "have not been substantiated by examination findings." On the other

10   hand, Dr. Rosenfeld, determined that Linich's "subjective complaints do preclude her ability

11   to work," noting that "[a]ll too often in chronic fatigue syndrome, there are no objective

12   physical findings . . .[and]  ultimately [it] is a disease of exclusion." Furthermore, Dr.

13   Rosenfeld found that "the claimant does, in fact, meet the major and at least four minor

14   criteria as outlined by the [Centers for Disease Control] case definition," and that "none of

15   the occupations noted in the Labor Market Survey . . . would be appropriate."

16                                         **Discussion**

17          In many respects, this case is troubling, but perhaps the most perplexing is the nature

18   of Linich proffered illnesses, Fibromyalgia and CFS. The origins of Fibromyalgia and CFS

19   are either unknown or not properly understood, their symptoms are largely subjective and

20   vary in intensity from patient to patient. They are medical conditions that are often

21   diagnosed through a process of exclusion, whereby a firm medical diagnoses is reached only

22   after other reasonable medical conclusions have been explained away. With respect to

23   Fibromyalgia, the leading Ninth Circuit case discussing the illness notes that there are no

24   objective laboratory tests to "establish the presence or absence of the disease, it is

25   characterized as an "ill-defined, poorly understood set of symptoms," associated with a

26   feeling of generalized pain in multiple regions of the body.  See Jordan, 370 F.3d at 872-73.

27     According to the American College of Rheumatology, a diagnosis of Fibromyalgia  is

28   deemed "appropriate for an otherwise unexplained condition in which a patient complains

of pain on the left side of the body, the right side of the body, above the waist, and in the axial skeleton, and in at least 11 of 18 specified points when the examining physician palpates them with his thumb."   Id. at 877 (citing Frederick Wolde, et al., *The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia*, 33 Arthritis and Rheumatism (No. 2) 160, 171 (Feb. 1990)).   With respect to CFS, the Sixth Circuit has commented that "[the] syndrome is marked by incapacitating fatigue that rest does not relieve; it is frequently associated with decreased concentration, irritability, sleep disturbances, recurrent sore throats, low-grade temperatures, swollen glands, and bone or muscle aches. . . . The cause of the syndrome is unknown, and the patient's symptoms may wax and wane, are difficult to validate objectively, but are subjectively debilitating." Rose v. Hartford Fin. Servs. Group, 268 Fed. Appx. 444, 446 n.3 (6th Cir. 2008) (quoting *Taber's Cyclopedic Medical Dictionary* 402 (19th ed. 2001)).   As such, Fibromylagia and CFS present problems in the world of disability law; for plan administrators who have to determine the weight of a claimant's highly subjective symptoms, and for reviewing courts who ultimately pass over their judgment.

As a preliminary matter, Linich raises two arguments that can be disposed of relatively quickly.  Linich first contends that, as a matter of law, Broadspire abused its discretion when it failed to show adequate deference to medical determinations made by Linich's treating physicians.  (Dkt.#62, pp. 10-11.)  The Circuit law on this issue is well settled.  An award of benefits under the Social Security Act is not binding on claims administrators because the so called "treating physician rule," which requires that greater weight be given to the opinions of a treating physician unless rejected by specific substantial evidence in the record, is inapplicable in the ERISA context.   Madden v. ITT Long Term Disability Plan, 914 F.2d 1279, 1285 (9th Cir.1990); Butler v. Shoemake, 173 F. Supp. 2d 1069, 1076 (D. Or. 2001).   Broadspire was in no sense obligated to show special deference to Linich's primary care physicians.  While the findings and recommendations of Linich's treating physicians are indeed relevant to a fair and full assessment of her claim, their opinions—if Broadspire so chooses—need not be given any more weight than other evidence

1    found in the administrative record, including evaluations conducted by plan sponsored peer

2    review physicians.

3    　　Linich next claims that as plan administrator Broadspire has an intractable conflict

4    of interest because its claim handlers were required to "focus on the bottom line" and take

5    calculated financial risks to avoid paying out meritorious benefits claims.  (Dkt.#62, pp.

6    5-6.); (PSOF ¶ 81.)　　To this end, Linich has provided the Court with the employee

7    performance review of Aimee Vergara, the Broadspire claims adjuster who managed Linich's

8    claim.  (PSOF Exhibit 1, pp. 1598-1602.)　Defendant counters by arguing that the district

9    court may only review evidence found in the administrative record, and Vergara's review

10   should therefore be disregarded.　See Alford v. DHC Found. Group Long-Term Disability

11   Plan, 311 F.3d 955, 959 (9th Cir. 2002) ("When courts apply the abuse of discretion

12   standard, they generally limit review to the record before the plan administrator when making

13   the benefits determination.").　In Abatie v. Alta Health & Life Ins. Co., the en banc Ninth

14   Circuit held that the use of extrinsic evidence was permitted in limited circumstances,

15   writing, "[t]he district court may, in its discretion, consider evidence outside the

16   administrative record to decide the nature, extent, and effect on the decision-making process

17   of any conflict of interest; the decision on the merits, though, must rest on the administrative

18   record once the conflict (if any) has been established, by extrinsic evidence or otherwise."

19   458 F.3d 955, 970 (9th Cir. 2006) (en banc).　So while this Court will consider allegations

20   of Broadspire's conflict of interest, it is mindful of the fact that the Parties have already been

21   given an opportunity to brief this issue, which the Court addressed in its April 15, 2008

22   Order.  The Court also notes that the recent Supreme Court decision in MetLife— which held

23   that "[i]f a benefit gives discretion to an administrator or fiduciary who is operating under

24   a conflict of interest, that conflict must be weighed as a factor in determining whether there

25   is an abuse of discretion"—means the standard of review would remain unchanged,

26   irrespective of the outcome of this Court's conflict of interest analysis.　See 128 S.Ct. at

27   2347-48 (internal quotations omitted).　Nevertheless, after a thorough review of Vergara's

28   employment records, the Court finds no proof that the ultimate denial of Linich's claim was

1    predicated upon a structural conflict of interest, or that Broadspire's decision was in any

2    sense related to "malice," "self-dealing, or [] parsimonious claims-granting."   See Abatie,

3    458 F.3d at 968.   Therefore, the Court declines to include or weigh Broadspire's alleged

4    conflict of interest while reviewing the plan administrator's decision under an abuse of

5    discretion standard.

6        The Court will now turn to a more substantive review of the administrative record.

7    With respect to the April and May 2004 denial of benefits letters, Linich contends these

8    decisions were in clear error,   See Boyd, 410 F.3d at 1178, since they were plainly

9    unsupported by substantial evidence found in the administrative record.   See Snow, 87 F.3d

10   at 332.   The Court agrees.

11       The only reasonable inference that can be drawn from a searching review of the

12   administrative record is that Broadspire's initial decision relied exclusively on three

13   documents: Dr. Zide's peer review report, the Employability Assesment Report and the

14   Labor Market Survey.   There is nothing in the administrative record that would allow the

15   Court to conclude that Broadspire's claim handlers, when denying Linich's LTD claim in

16   April and May 2004, considered any part of Linich's extensive medical history, which dated

17   back to early 1998.   The April 2004 letter is two-pages long, makes no reference to any

18   medical documentation other than Dr. Zide's peer review findings, and the overwhelming

19   majority of its text is lifted directly from that report.   Similarly, the May 2004 letter utilizes

20   only the Employability Assessment and Labor Market Survey, and there is nothing in the

21   May 2004 denial letter to suggest that Broadspire reviewed any other medical evidence of

22   Linich's alleged disability.[4]  As the Court will discuss, reliance on these documents was

23   highly problematic.

24

25   _____

        [4]The Court is aware that Broadspire likely considered Dr. Zide's peer report, since the

26   May 2004 letter made passing reference to it.   However, because the Employability

27   Assessment and Labor Market Survey were in part based on Dr. Zide's conclusions, that
     distinction is immaterial. Also, the Employability Assessment Report notes that the evaluator

28   spoke with Linich over the  telephone concerning her work history.

1    With respect to Dr. Zide's peer review report, which the April 2004 letter reiterated

2    almost verbatim, that document cannot be considered substantial evidence, since it was not

3    predicated upon a fair review of Linich's complete medical records.  Through no apparent

4    fault of his own, Dr. Zide's evaluation of Linich's claim was formulated after reviewing

5    documentation that had been faxed to Broadspire by Dr. Crowe on February 20, 2004.

6    Broadspire provided him with no additional material to consider, even though it had such

7    evidence in its possession.[5]  Additionally, the documents that were included in the Febraury

8    transmission consisted of no more than eight pages of office notes, a single APS and EPA

9    by Dr. Crowe, and one consultation report from Dr. Biesbroeck.   The Court has gone

10   through these papers and finds them to be utterly lacking in specificity, breadth, or quality.

11    The eight pages of office notes are handwritten and barely legible.  They simply do not

12   adequately represent Linich's substantial medical history from 1997 through 2004.  With

13   respect to Dr. Crow's EPA, it contains nothing but a series of boxes that the treating

14   physician was supposed to scan through and then check off.   The APS is similarly

15   handwritten, terse, and of a generally poor quality.   The APS and EPA do not contain much

16   of a narrative statement by Dr. Crowe, nor do they refer to or explain the years of treatment

17   that Linich had already received under his care.  More problematic still, is the fact that Dr.

18   Zide did not have the opportunity to review a single document prepared by Dr. Bennett or

19   the reports from Drs. Ladin and Jou, which had been commissioned by Intracorp in 1999.

20   It is still not quite clear to the Court why Broadspire chose to contact Dr. Biesbroeck, but not

21

22        [5]It is settled that the district court may not look at new evidence to find a

23   determination unreasonable because that evidence was not before the decision-maker at the
     time of the decision.  Taft v. Equitable Life Assurance Soc'y, 9 F.3d 1469, 1472 (9th Cir.

24   1993).  The administrative record consists of those materials in the record at the time
     Defendant's decision was made.  Haynes v. United States, 891 F.2d 235, 238 (9th Cir.1989).

25   In the instant case, Broadspire without question possessed more documentation relating to

26   Linich's claim than what was transmitted to Dr. Zide.   At a minimum, Braodspire is charged
     with constructive knowledge of all documents that Linich submitted to previous plan

27   administrators, Intracorp and Kemper, including the reviews conducted by Drs. Ladin and

28   Jou.

1   Dr. Bennett.   This is particularly strange when one considers that Dr. Bennet is a

2   rheumatology specialist and had been treating Linich since 1998.   See   Sarchet v. Chater,

3   78 F.3d 305, 307 (7th Cir. 1996) ("[f]ibromyalgia is a rheumatic disease and the relevant

4   specialist is a rheumatologist.").   On the other hand, Dr. Biesbroeck is an endocrinonologist

5   who diagnosed Linich with Type II diabetes while briefly treating her in 2003, and Linich,

6   never claimed that her diabetic condition rendered her disabled or that her diabetes in any

7   way effected her CFS and Fibromyalgia diagnoses.   Dr. Biesbroeck's treatment history,

8   therefore, has limited relevance to the merits of Linich's LTD claim.   Another perplexing

9   aspect of Dr. Zide's report is that his ultimate conclusion appears to be based in part on his

10  unsuccessful attempts to contact Dr. Crowe four times over a three-day period.   Indeed, after

11  Dr. Zide noted that he had not been able to speak with Dr. Crowe, he wrote that in light of

12  the circumstances there was "no alternative but to find no support for functional

13  impairment." (DSOF Exhibit 17.)   Without assessing fault for the miscommunication

14  between the doctors, at a minimum Dr. Zide should not have formulated an opinion as to

15  Linich's disability claim based in part on her treating physician not promptly returning

16  several phone calls over a condensed time period.

17        Similarly, the Employment Assessment and Labor Market Survey, which the May

18  2004 denial letter is predicated upon, are in clear error, since the results of these quantitative

19  studies are predicated upon Dr. Zide's erroneous medical conclusions.   Both reports state

20  that their findings were consistent with and utilized Dr. Zide's medical opinion.   In fact, Dr.

21  Zide's report served as a house of cards, without which the findings of the Employability

22  Assessment and Labor Market Survey would not have been possible.   Therefore, because Dr.

23  Zide's report was in clear error due to its fundamentally flawed nature, reliance upon such

24  a document was also improper.   "An opinion based on an incomplete set of assumptions

25  cannot be considered a valid basis for a determination." O'hartz v. Cal. State Auto. Ass'n

26  Inter-Ins. Bureau Group Long Term Disability Plan, 2008 U.S. Dist. LEXIS 67625, at *26

27  (N.D. Cal. Sept. 3, 2008) (citing Osenbrock v. Apfel, 240 F.3d 1157, 1165 (9th Cir. 2001)).

28

1    In its briefing, Broadspire contends that the burden was on Linich to prove she was

2  disabled, and that it did not fall upon the claims administrator to demonstrate the lack of a

3  disability.  See Jordan, 63 F. Supp. 2d at 1157;  Piscottano v. Metro. Life Ins. Co., 118 F.

4  Supp. 2d 200, 215 (D. Conn. 2000) ("Where, as here, the LTD Plan requires the claimant to

5  submit evidence of continuing disability, the burden of establishing disability lies on the

6  claimant, and the plan administrator is not required to prove that the claimant is not

7  disabled.").   Broadspire   argues   that   Linich   simply   failed   to   present   enough

8  evidence–subjective or otherwise–to convince its claim handlers that she was disabled in

9  April and May 2004.  While as a general legal proposition Broadspire is correct, there are

10  two serious flaws with its contention.  First, Broadspire controlled the information that was

11  requested, not Linich.  It was Broadspire that sent out ambiguous and incomplete document

12  requests between November 2003 and February 2004.  Judging from the series of letters that

13  were received by Linich and her doctors during that period of time, it is not readily apparant

14  whether Broadspire was seeking anything more than recent laboratory tests or updated

15  reports relating to Linich's treatment.  If in fact Broadspire was seeking Linich's complete

16  medical file, it should have told her so and then in a straightforward manner requested such

17  information from her and her doctors.[6]  Broadspire cannot make a request for only a portion

18  of Linich's medical file, neglect to serve that request on one of Linich's two primary treating

19  physicians, and then deny Linich's claim for a lack of medical evidence.   Under the

20  circumstances, Linich should not be held accountable for errors committed by the claim

21  administrator in failing to contact Dr. Bennett, or for the confusion that occurred in the

22  transition between Kemper and Broadspire.

23    Secondly, even if Linich should have taken the initiative to send Broadspire her

24  records from Dr. Bennett or send an otherwise complete medical file to Broadspire, it

25  remains a mystery to the Court why Dr. Zide, the employability assessment evaluator and

26

27    [6]The Court notes that there are several references to Dr. Bennett in the Febaury 20,
   2004 materials; enough to have raised a serious questions in the mind of the claims handler
28  or peer reviewing doctor as to the completeness of information they possessed.

1    labor market surveyor did not have access to the 1999 reports by Drs. Ladin and Jou, since

2    these documents were certainly in Broadspire's possession at the time.[7]  Furthermore, while

3    it is technically accurate for Broadspire to cite case law that places the burden of proof on

4    Plaintiff, not the plan administrator, the instant case is somewhat unique.  Linich had already

5    been approved for LTD benefits in 1999 by Broadspire's predecessor, and was subject to a

6    *post facto* review of her claim.  (DSOF ¶9.)  Because Linich had already been adjudicated

7    as disabled by a previous plan administrator, she and the two physicians that were contacted

8    in November 2003 would have been justified in taking Broadspire's limited document

9    request at face value.  See Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d

10   863, 871 (9th Cir. 2008) (noting that applying for and receiving LTD benefits indicates a

11   claimant has already been deemed disabled under the terms of the plan).

12         In sum, there are too many gaps, inconsistencies and unanswered questions in

13   Broadspire's April and May 2004 denial letters for reasonable minds to accept such evidence

14   as adequate to justify the denial of Linich's LTD benefits.  See Snow, 37 F.3d at 1404.  The

15   Court therefore finds Broadspire initially abused its discretion in denying Linich's LTD

16   claim in April and May 2004.  However, the Court's inquiry does not stop there.  Rather, the

17   Court must turn to analyze whether, in light of the erroneous denial, Broadspire provided

18   Linich with an appellate justification that was strong enough to overcome its previous error.

19   To aid the Court with such a task, the Parties were directed at oral argument to file

20   supplemental briefing on this precise issue. (See Dkt.##70,71.)

21         With respect to the appellate process, Broadspire argues that because its ultimate

22   decision was based on a thorough review of Linich's entire medical file and the medical

23   conclusions of ten peer reviewing physicians, under a deferential standard of review, that

24   decision should be affirmed.  This Court agrees.  First, both of Broadspire's appellate

25   decisions adequately demonstrate that it had access to and considered Linich's complete

26

27         [7]The Court is unmoved by Broadspire's attempt to downplay the significance of these
     reports by arguing that Dr. Jou "never reviewed [P]laintiff's benefits claim under the
28   appropriate standard," i.e., an inability to perform any job.  (See Dkt.#64 p. 10  n.5.)

medical history.   In Broadspire's August 10, 2004 letter, Broadspire listed the documents that it had considered in rendering its determination.  These documents included, among other things, Linich's comprehensive history of medical treatment under her primary physicians, the 1999 reports of Dr. Ladin and Jou, a Notice of Award of Benefits from the Social Security Administration, and progress reports from Intracorp between 1996 and 1999. Broadspire's final determination letter, dated July 6, 2005, is even more comprehensive. There is nothing in the record to suggest that Broadspire performed a half-hearted review of this evidence, or "cherry-picked" it, as Linich contends, and the Court is unwilling to conclude that Broadspire acted in bad faith.  Next, Broadspire reasonably relied on its peer review physicians–other than Dr. Zide–in upholding its denial of Linich's LTD claim. Before issuing its August 10, 2004 appeal, Broadspire contacted four doctors to review Linich's claim, and all four–Dr. Hoffman, Dr. Mendelssohn, Dr. Caldwell and Dr. Bowman–concluded Linich was not disabled.   Again, before it issued its final appellate decision on July 6, 2005, Broadspire contacted four more doctors—Dr. Weinstein, Dr. Rosenfeld, Dr. Burstein and Dr. Sherrer.[8]  Three out of those four reviewing physicians also found Linich was not disabled under the meaning of the plan.  While "[a]n ERISA administrator's exercise of its discretion to adjudicate claims is not a mere exercise expert poll-taking," Boyd, 410 F.3d at 1179, Broadspire correctly points out that the overwhelming

---

[8] The cumulative impact of these expert opinions is strong, even though the Court might be inclined to quibble with the purported utility of some of Broadspire's reviewing physicians.  For instance, the relative weight that should be given to Dr. Bowman's opinion is low, since she in an endocrinologist, and her report focuses on Linich's Type II diabetes, an irrelevant issue.  Additionally, the opinions of Dr. Mendelssohn and Burstein, both psychologists, have diminished significance, since the Ninth Circuit "recognizes fibromyalgia as a physical rather than a mental disease." Jordan, 370 F.3d at 873, 873 n.10 (citing Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc., 125 F.3d 794, 796, 799 (9th Cir. 1997)). Notwithstanding those three opinions, Broadspire may have more heavily relied on the conclusions of Dr. Hoffman, Dr. Caldwell, Dr. Weinstein, Dr. Sherrer, and Dr. Rosenfeld, who were all either internal medicine specialists, infectious disease specialists, or rheumatologists.  Out of these physicians, only Dr. Rosenfeld found Linich disabled.

majority of doctors who looked at Linich's claim concluded she was not disabled.  It is worth noting that these later physicians, unlike Dr. Zide, appeared to have had access to Linich's complete medical file.  Several of them even spoke with Dr. Crowe and Dr. Bennett.  That the opinions of these doctors, who all performed a fair and full review of Linich's claim, conflict with those of Linich's treating physicians, as previously mentioned, does not provide grounds for finding that Broadspire abused its discretion.  See Jordan, 370 F.3d at 875.  In light of the seemingly more comprehensive review performed by Broadspire during its appellate process, this Court cannot conclude that Broadspire abused its discretion when it ultimately denied Linich's LTD claim—even if its initial determination was in clear error.

Linich raises one final point that is worth addressing.  Linich argues that Broadspire acted arbitrarily by requiring her to submit objective evidence of disability–in the form of laboratory tests or other diagnostic test results–when such evidence, by definition, could not plausibly exist given to the nature of Linich's illnesses.  The Court does not agree with this characterization.  Broadspire was not in fact asking for the impossible when it requested additional information in May and August 2004.  First, Linich was clearly  not limited to submitting objective evidence.  For example, in August 2004, Broadspire told Linich that she was entitled to update the administrative record to prepare for a final review of her claim, Broadspire specifically asked for "any . . . pertinent medical information that you or your provider feels would substantiate your disability." While Linich could have provided the plan administrator with objective test results to help substantiate her claim, Broadspire's appellate information requests were certainly not limited to such information.  Secondly, Linich's focus on the supposed distinction between subjective and objective evidence is misplaced.  As the Ninth Circuit has noted, "[t]hat a person has a true medical diagnosis does not by itself establish disability."  Jordan, 370 F.3d at 880.  There is a world of difference between requiring Linich to prove the accuracy of her CFS or Fibromyalgia diagnosis with something like a simple blood test, which does not exist, and requiring Linich to submit additional evidence, objective or otherwise, in order to verify the severity of her symptoms.  The latter would be proper a request, while the former would not.  A plan administrator does not act

- 23 -

unreasonably by requiring a plaintiff to submit additional evidence for the purpose of determining whether symptoms of an inherently subjective disease, such as CFS or Fibromyalgia, have manifested in such a way as to render the claimant disabled, and the district court should not be in the habit of substituting its own judgment for that of plan administrators.   See Jordan, 370 F.3d at 875.

**Accordingly,**

**IT IS HEREBY ORDERED** granting Defendant's Motion for Summary Judgment. (Dkt.#55).

**IT IS FURTHER ORDERED** directing the Clerk to enter judgment accordingly.

DATED this 23rd day of March, 2009.

_____
Mary H. Murguia
United States District Judge